# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

Blue Cross and Blue Shield of
Georgia, Inc.; Blue Cross of California,
Inc. d/b/a/ Anthem Blue Cross; Anthem
Blue Cross Life and Health Insurance
Company; Rocky Mountain Hospital and
Medical Service, Inc. d/b/a Anthem Blue
Cross and Blue Shield; Anthem Health
Plans, Inc. d/b/a Anthem Blue Cross
and Blue Shield; Blue Cross Blue Shield
Healthcare Plan of Georgia, Inc.; Anthem
Insurance Companies, Inc. d/b/a
Anthem Blue Cross and Blue Shield;
Anthem Health Plans of Kentucky, Inc.
d/b/a Anthem Blue Cross and Blue
Shield; Anthem Health Plans of Maine,
Inc. d/b/a Anthem Blue Cross and Blue
Shield; RightCHOICE Managed Care,
Inc.; Healthy Alliance Life Insurance
Company; HMO Missouri, Inc.; Anthem
Health Plans of New Hampshire, Inc.
d/b/a Anthem Blue Cross and Blue
Shield; Empire HealthChoice Assurance,
Inc. d/b/a Empire Blue Cross and Blue
Shield; Community Insurance Company
d/b/a Anthem Blue Cross and Blue
Shield; Anthem Health Plans of Virginia,
Inc. d/b/a Anthem Blue Cross and Blue
Shield; HMO Healthkeepers, Inc. d/b/a
Anthem Blue Cross and Blue Shield; Blue
Cross Blue Shield of Wisconsin d/b/a
Anthem Blue Cross and Blue Shield;

**COMPLAINT**

JURY TRIAL DEMANDED

CIVIL ACTION NO: _____

Compcare Health Services Insurance
Corporation d/b/a Anthem Blue Cross
and Blue Shield;

                Plaintiffs,

  v.

DL Investment Holdings, LLC f/k/a
Durall Capital Holdings, LLC d/b/a
Chestatee Regional Hospital; Reliance
Laboratory Testing, Inc.; Medivance
Billing Service, Inc.; Aaron Durall; Jorge
Perez; and Neisha Carter Zaffuto;

                Defendants.

---

Plaintiffs Blue Cross and Blue Shield of Georgia, Inc. ("**BCBS Georgia**");

Blue Cross of California, Inc. d/b/a/ Anthem Blue Cross; Anthem Blue Cross

Life and Health Insurance Company; Rocky Mountain Hospital and Medical

Service, Inc. d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans,

Inc. d/b/a Anthem Blue Cross and Blue Shield; Blue Cross Blue Shield

Healthcare Plan of Georgia, Inc.; Anthem Insurance Companies, Inc. d/b/a

Anthem Blue Cross and Blue Shield; Anthem Health Plans of Kentucky, Inc.

d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Maine, Inc.

d/b/a Anthem Blue Cross and Blue Shield; RightCHOICE Managed Care, Inc.;

Healthy Alliance Life Insurance Company; HMO Missouri, Inc.; Anthem Health

Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield;

Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield;

Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield;

Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield; HMO Healthkeepers, Inc. d/b/a Anthem Blue Cross and Blue Shield;

Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield;

Compcare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue Shield (collectively, the "**BCBS Plans**") by and through the undersigned counsel, hereby file this Complaint against Defendants DL Investment Holdings, LLC, which does business as Chestatee Regional Hospital, and was formerly known as Durall Capital Holdings, LLC ("**Chestatee**" or "**Durall Capital**"),[1] Reliance Laboratory Testing, Inc. ("**Reliance Labs**"), Medivance Billing

---

[1] "Chestatee" and "Durall Capital" both refer to Defendant DL Investment Holdings, LLC f/k/a Durall Capital Holdings, LLC, the entity that acquired Chestatee Regional Hospital in August 2016 and now does business under that name. Where used, "Durall Capital" refers to this entity prior to its acquisition of Chestatee Regional Hospital.

"Chestatee Regional Hospital" refers to the hospital in Dahlonega, Georgia, including prior to its purchase by Durall Capital or when distinguishing between the off-site operations of Durall Capital (in Florida) and the on-site operations of the hospital (in Georgia) after the acquisition.

Service, Inc. ("**Medivance**"), Aaron Durall, Jorge Perez, and Neisha Carter Zaffuto (collectively, "**Defendants**").

The BCBS Plans further state and allege as follows:

## NATURE OF THE ACTION

1.     Since at least 2016, Defendants have engaged in a widespread fraudulent scheme to enrich themselves at the BCBS Plans' expense by billing for laboratory services that were not payable, were fraudulent, were in violation of contracts between BCBS Georgia and Chestatee Regional Hospital, and were otherwise unlawful.

2.     Plaintiffs are subsidiaries of Anthem, Inc., an independent licensee of the Blue Cross and Blue Shield Association.

3.     Chestatee Regional Hospital is a 49-bed hospital located in Dahlonega, Georgia.

4.     Until August 2016, Chestatee Regional Hospital was owned by Southern Health Corporation of Dahlonega.

5.     BCBS Georgia's relationship with Southern Health Corporation of Dahlonega was governed by three contracts.  Among other things, the contracts rendered Chestatee Regional Hospital a participating provider in BCBS Georgia's provider network and established the rates at which BCBS Georgia would

reimburse Chestatee Regional Hospital for the provision of medically necessary services to the enrollees of the BCBS Plans.

6.      In August 2016, Defendant Durall Capital purchased Chestatee Regional Hospital from Southern Health Corporation of Dahlonega for about $15 million.

7.      At that time, BCBS Georgia allowed Southern Health Corporation of Dahlonega to assign its rights, duties, and obligations under the contracts to Durall Capital.

8.      However, unbeknownst to BCBS Georgia, as soon as it took control of Chestatee Regional Hospital, Durall Capital agreed with Defendant Reliance Labs, a non-participating toxicology laboratory located in Sunrise, Florida, to fraudulently bill BCBS Georgia for testing performed at and by Reliance Labs (or other non-participating laboratories engaged by the Defendants), as if the testing had been performed at and by Chestatee Regional Hospital.

9.      Aaron Durall is the President of Reliance Labs, the Chief Executive Officer of Chestatee, and the Manager of Durall Capital, and caused Chestatee to enter into the agreement with Reliance Labs.

10.    Aaron Durall and Chestatee engaged Defendant Jorge Perez to manage Chestatee's finances and billing services, and to assist in the management of the pass-through billing scheme described herein.

11.    Aaron Durall and Chestatee engaged Defendant Medivance to provide the billing and collections services necessary for the success of the scheme alleged herein.  In this capacity, Medivance submitted the claims at issue to BCBS Georgia.

12.    Defendant Neisha Carter Zaffuto is President of Medivance and was responsible for overseeing and directing the submission of the claims at issue to BCBS Georgia, on behalf of the other Defendants.

13.    Chestatee, Reliance Labs, Medivance, Aaron Durall, Jorge Perez, and Neisha Carter Zaffuto agreed to bill BCBS Georgia for laboratory tests as if they had been performed at and by Chestatee, when in fact they were performed at and by Reliance Labs (or other non-participating laboratories engaged by the Defendants), in order to take advantage of Chestatee's participating status with—and favorable reimbursement rates from—BCBS Georgia.

14.    The claims at issue include, but are not limited to, urine drug testing ("**UDT**") claims and blood drug testing ("**BDT**") claims.

15.     To maximize their profits, Defendants leveraged a nationwide network of healthcare providers and laboratories, who provided their patients' specimens because the pass-through scheme made the testing immensely profitable.

16.     Some of the referring healthcare providers and laboratories provided their patients' specimens in exchange for a cut of the amount that Chestatee was reimbursed by BCBS Georgia.

17.     The patients were never present at Chestatee, were never treated by Chestatee-credentialed healthcare providers, and were located in areas not serviced by Chestatee.  Instead, their only connection to Chestatee was that their testing was billed through Chestatee by the Defendants, in order to take advantage of Chestatee's participating status and favorable reimbursement rates with BCBS Georgia.

18.     Upon information and belief, when the referring healthcare providers ordered the testing at issue in this case, they ordered it to be tested by certain non-participating laboratories (including, but not limited to, Reliance Labs).

19.     Had the claims been billed to the BCBS Plans directly by Reliance Labs (or the other non-participating laboratories where the testing was

7

performed), many of the claims would not have been paid, and those that were

would have been paid at substantially lower rates.

20.     Defendants retained a substantial percentage of the funds

reimbursed by the BCBS Plans for these laboratory services.

21.     The increased volume of UDT claims billed by Chestatee because of

this scheme is staggering.  In the year before the implementation of the scheme,

Chestatee submitted to BCBS Georgia an average of approximately 30 UDT

claims per month.  In the year after the implementation of the scheme, Chestatee

submitted to BCBS Georgia an average of approximately 4,800 UDT claims per

month (an increase of 16,000%).

22.     UDT now constitutes the vast majority of the claims that Chestatee

submits to BCBS Georgia.  Specifically, between the implementation of the

scheme and late 2017, Chestatee submitted, on average, approximately $12.7

million per month in claims for UDT from BCBS Georgia, when it billed only

about $1.2 million per month to BCBS Georgia for *all other* hospital claims.

23.     This was done in spite of the fact that Defendants knew that the

claims they submitted or caused to be submitted to BCBS Georgia were not

payable by the BCBS Plans, were fraudulent, were in violation of Chestatee's

contracts with BCBS Georgia, and were otherwise unlawful.

24.     The purpose of the scheme was to increase the amount that Defendants received from the BCBS Plans, without regard to the reasonableness or medical necessity of the underlying testing.

25.     The BCBS Plans bring this action in order to put a stop to Defendants' unlawful scheme.

26.     The BCBS Plans seek compensation and equitable relief for the injuries that they have incurred because of Defendants' conduct. In addition, the BCBS Plans seek punitive damages, and injunctive relief prohibiting Defendants from further perpetrating the scheme and requiring Chestatee to comply with its contractual obligations to BCBS Georgia.

## JURISDICTION AND VENUE

27.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the matter in controversy is in excess of $75,000, exclusive of interest and costs, and is between citizens of different states.

28.     This Court also has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Plaintiffs' claims arise under the Constitution, laws, or treaties of the United States.

29.     The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, because the state law claims are so related to the

claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## THE PARTIES

### PLAINTIFFS

31.     Plaintiff Blue Cross and Blue Shield of Georgia, Inc. is incorporated and headquartered in Georgia, and entered into two of the contracts at issue with Chestatee.

32.     Plaintiff Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. is incorporated and headquartered in Georgia, and entered into one of the contracts at issue with Chestatee.

33.      Plaintiff Blue Cross of California d/b/a Anthem Blue Cross is incorporated and headquartered in California.

34.     Plaintiff Anthem Blue Cross Life and Health Insurance Company is incorporated and headquartered in California.

35.     Plaintiff Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield, is incorporated and headquartered in Colorado.

36.     Plaintiff Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Connecticut.

37.     Plaintiff Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Indiana.

38.     Plaintiff Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Kentucky.

39.     Plaintiff Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Maine.

40.     Plaintiff RightCHOICE Managed Care, Inc. is incorporated in Delaware and headquartered in Missouri.

41.     Plaintiff Healthy Alliance Life Insurance Company is incorporated and headquartered in Missouri.

42.     Plaintiff HMO Missouri, Inc. is incorporated and headquartered in Missouri.

43.     Plaintiff Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in New Hampshire.

44.     Plaintiff Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield is incorporated and headquartered in New York.

45.     Plaintiff Community Insurance Company d/b/a/ Anthem Blue Cross and Blue Shield is incorporated and headquartered in Ohio.

46.     Plaintiff Anthem Health Plans of Virginia, Inc. d/b/a/ Anthem Blue Cross and Blue Shield is incorporated and headquartered in Virginia.

47.     Plaintiff HMO HealthKeepers, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Virginia.

48.     Plaintiff Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Wisconsin.

49.     Plaintiff Compcare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Wisconsin.

## DEFENDANTS

50.     Defendant DL Investment Holdings, LLC f/k/a Durall Capital Holdings, LLC d/b/a Chestatee Regional Hospital, is a Florida limited liability

company.  Upon information and belief, all of the members of this entity are residents of Florida.

51.     Defendant Reliance Laboratory Testing, Inc. is incorporated and headquartered in Florida.  Specifically, the company operates a toxicology laboratory located in Sunrise, Florida.

52.     Defendant Medivance Billing Service, Inc. is incorporated and headquartered in Florida.  Specifically, its headquarters is located in Sunrise, Florida.

53.     Defendant Aaron Durall is a Florida resident and an attorney admitted to practice in that state.

54.     Defendant Jorge Perez is a Florida resident.

55.     Defendant Neisha Carter Zaffuto is a Florida resident.

## THE BCBS PLANS

### THE BLUECARD PROGRAM

56.     Plaintiffs are subsidiaries of Anthem, Inc., an independent licensee of the Blue Cross and Blue Shield Association ("**BCBS Association**").

57.     Plaintiffs are participants in the BCBS Association's BlueCard program, which allows members of one BCBS Association licensee's health plans

to obtain healthcare in another BCBS Association licensee's service area (e.g., where a member is traveling or living outside of their home plan's service area).

58.     Because Chestatee is located in BCBS Georgia's service area, services billed by Chestatee for any BCBS Association licensee's members were billed to BCBS Georgia.

59.     BCBS Georgia then reconciled the cost of the services billed by Chestatee with the BCBS Association licensee responsible for each member.[2]

60.     As a result, each of the BCBS Plans was harmed by the fraudulent scheme alleged herein.

## MANAGED CARE AND THE BCBS PLANS

61.     The BCBS Plans are insurers and third-party claims administrators for group health plans that provide benefits to covered individuals and dependents.

---

[2]   For example, if a BCBS Illinois member received treatment in Georgia from a healthcare provider that is in-network with BCBS Georgia, the BCBS Illinois member would be treated as in-network by the Georgia healthcare provider. Under the BlueCard program, the provider would submit its claim to BCBS Georgia.  BCBS Georgia would pay the healthcare provider for the services rendered, and would then reconcile the cost of those services with BCBS Illinois.

62.     The BCBS Plans may insure group health plans directly (the "**Fully-Insured Health Plans**").  For the Fully-Insured Health Plans, the BCBS Plans resolve claims and makes benefit payments from their own assets.

63.     The BCBS Plans also provide administrative services to self-funded group health plans (the "**Self-Funded Health Plans**").  The BCBS Plans deliver these services pursuant to Administrative Services Agreements between the BCBS Plans and the group health plan's sponsor (usually an employer), which identify the rights and obligations of each party.  Many of the group health plans sponsored by private employers are governed by ERISA, 29 U.S.C. § 100 *et seq.* The BCBS Plans provide insurance and/or administrative services to these employer-sponsored group health plans, including the processing of claims for reimbursement of medical services provided to the individuals covered by these benefit plans.

64.     The BCBS Plans paid claims to Chestatee on behalf of a number of Self-Funded Health Plans, and seek redress in this lawsuit for those Self-Funded Health Plans.

65.     The BCBS Plans' Administrative Service Agreements state:

> Pursuant to Section 405(c)(1) of ERISA, Employer delegates to [BCBS Plan] fiduciary authority to determine claims for benefits under the Plan as

15

well as the authority to act as the appropriate fiduciary under Section 503 of ERISA to determine appeals of any adverse benefit determinations under the Plan. [BCBS Plan] shall administer complaints, appeals and requests for independent review according to [BCBS Plan's] complaint and appeals policy, and any applicable law or regulation unless otherwise provided in the Benefits Booklet. In carrying out this authority, [BCBS Plan] is delegated full discretion to determine eligibility for benefits under the Plan and to interpret the terms of the Plan

66.     Accordingly, each of the Self-Funded Health Plans delegated to the BCBS Plans the discretionary authority to determine claims for benefits.

67.     In this capacity, the BCBS Plans have processed claims and administered appeals on behalf of all of the Self-Funded Health Plans.

68.     Similarly, the impacted Self-Funded Health Plans have given the BCBS Plans the authority and discretion to recover overpayments.  Specifically, the Administrative Service Agreements state:

Employer grants [BCBS Plans] the authority and discretion to . . . (1) determine and take steps reasonably necessary and cost-effective to effect recovery; (2) select and retain outside counsel; (3) reduce any recovery obtained on behalf of the Plan by its proportionate share of the outside counsel fees and costs incurred during litigation or settlement activities to obtain such recover; and (4) negotiate and effect any settlement of the Employer's and Plan's rights . . . .

69.     Accordingly, the BCBS Plans have authority to seek recovery on behalf of the impacted Self-Funded Health Plans and for payments made by the Fully-Insured Health Plans.

### ANTHEM'S NETWORK OF PARTICIPATING PROVIDERS

70.     Enrollees of BCBS Plans are considered the BCBS Plans' "members."

71.     The BCBS Plans rely upon networks of participating (also known as "in-network") healthcare providers.  Participating providers contract with BCBS Plans to accept a negotiated rate for their services, in exchange for, among other things, increased access to members of BCBS Plans (due to the savings available to the BCBS Plans' members who receive treatment from participating providers) and increased certainty with respect to the amount that they will receive from BCBS Plans for their services.

72.     On the other hand, non-participating (also known as "out-of-network") providers have not contracted with the BCBS Plans.  The reimbursement rates that BCBS Plans are required to pay non-participating providers are often less than BCBS Plans are contractually obligated to pay participating providers, and BCBS Plans' members are typically personally responsible for a larger share of the cost of those services.

73.     Chestatee is one of BCBS Georgia's participating providers.

74.     None of the other Defendants are participating providers, nor do any of them have contracts with BCBS Georgia or the other BCBS Plans.

## THE BCBS GEORGIA-CHESTATEE CONTRACTS

75.     The claims at issue in this lawsuit were submitted by Chestatee to BCBS Georgia under three contracts that govern the parties' relationship.

76.     In January 1987, BCBS Georgia entered into a Participating Hospital Agreement with St. Joseph Hospital of Dahlonega, Inc., d/b/a Chestatee Regional Hospital (the "**PAR Contract**").  A true and correct copy of the PAR Contract, as subsequently amended, is attached as Exhibit A hereto.

77.     In May 1998, HMO Georgia, Inc., a subsidiary of BCBS Georgia, entered into a Contract with Chestatee Regional Hospital (the "**HMO Contract**"). A true and correct copy of the HMO Contract, as amended, is attached as Exhibit B hereto.

78.     Also in May 1998, BCBS Georgia entered into a Hospital Agreement for Preferred Provider Program with Chestatee Regional Hospital (the "**PPO Contract**").  A true and correct copy of the PPO Contract, as amended, is attached as Exhibit C hereto.

79.     On August 19, 2016, the day that Durall Capital acquired Chestatee Regional Hospital, Southern Health Corporation of Dahlonega assigned the three contracts (HMO Contract, PAR Contract, and PPO Contract) to Durall Capital.

80.     Unaware of Chestatee's fraudulent intentions, BCBS Georgia consented to the assignments.

81.     Through the assignments, Durall Capital agreed "to be bound by all terms and conditions of" the Contracts, and BCBS Georgia and Durall Capital agreed that "all other terms and conditions of [the Contracts] remain[ed] in full force and effect." (*See* Exs. A-C).

## THE PAR CONTRACT

82.     The PAR Contract contains a number of provisions that make clear that BCBS Georgia was contracting to reimburse Chestatee only for hospital services *provided by* Chestatee to BCBS members.

83.     The PAR Contract states that Chestatee "shall *provide* Medically Necessary Hospital Services to Subscribers as provided in the applicable Benefit Agreement when ordered by a licensed physician or other licensed medical professionals and are within the bylaws of the hospital." (Ex. A at ¶ 4.1 (emphasis added)).

84.     Similarly, the first provision relating to BCBS Georgia's responsibilities under the PAR Contract states that BCBS Georgia must compensate Chestatee for "Covered Services *rendered* to Subscribers pursuant to the provisions of [the PAR Contract]." (Ex. A at ¶ 5.1. (emphasis added)).

85.     Other provisions of the PAR Contract make clear that it was intended to cover only services provided at and by Chestatee, including without limitation:

a.     Chestatee and BCBS Georgia agreed that the latter would "pay [Chestatee] *directly for Covered Services rendered to Subscribers*" pursuant to the PAR Contract. (Ex. A at ¶ 5.1 (emphasis added)).

b.     Chestatee's agreement to permit BCBS Georgia to conduct bill and utilization audits, and to conduct "such other activities as are deemed mutually necessary to ensure correct payment to [Chestatee] for Covered Services *rendered* to a Subscriber." (Ex. A at ¶ 4.7 (emphasis added)).

c.     The PAR Contract described payment for services not rendered at Chestatee Regional as being "made in error."  (Ex. A at ¶ 6.4).

86.     Chestatee was obligated to maintain "all appropriate records on Subscribers" receiving services at Chestatee.  (Ex. A at ¶ 8.1).

87.     Other terms of the PAR Contract relevant hereto include that Chestatee explicitly agreed that BCBS Georgia would be "permitted to recover from [Chestatee] amounts due to [BCBS Georgia] because of," among other things, "inaccurate payments, including payments based upon erroneous or incomplete information provided by [Chestatee.]"  (Ex. A at ¶ 6.4).

88.     Chestatee agreed not to assign its "rights, duties or obligations of the [Contract]," and not to subcontract the PAR Contract, or any portion thereof, without written consent from BCBS Georgia.  (Ex. A at ¶¶ 13.1–13.2).

89.     The PAR Contract provides that, in the event of a dispute that the parties cannot resolve, Chestatee and BCBS Georgia agree to submit the dispute to the Hospital Service Committee of the BCBS Georgia's Board of Directors. (Ex. A at ¶ 10.2).  However, there is no longer a Hospital Service Committee of BCBS Georgia's Board of Directors, nor is there a standing BCBS Georgia-specific Board of Directors.  In addition, the process would be futile, as it represents a non-binding resolution, and the BCBS Plans have no reason to believe that Chestatee will meaningfully participate in that process.

### THE HMO CONTRACT

90.     The HMO Contract establishes the contractual obligations of BCBS Georgia and Chestatee for the provision of health care services at Chestatee to

enrollees of BCBS Georgia and its affiliates' health maintenance organization ("HMO") plans.

91.     The HMO Contract contains a number of provisions that make clear that BCBS Georgia contracted to reimburse Chestatee only for services *provided by* Chestatee.

92.     Indeed, the first substantive provision of the HMO Contract, which details Chestatee's responsibilities under the Contract, states that Chestatee "shall *provide* to Members and Guest Members" in the hospital's service area "Covered Services in accordance with this Agreement, when such services are ordered by a Physician or other licensed health professional."  (Ex. B at ¶ 3.1 (emphasis added)).

93.     Similarly, the first provision relating to BCBS Georgia's responsibilities states that BCBS Georgia must compensate Chestatee for "Covered Services *rendered by* [Chestatee] to Members[.]"  (Ex. B at ¶ 5.2 (emphasis added)).

94.     Other provisions of the HMO contract make abundantly clear that it was intended to cover only services provided by Chestatee Regional, including:

    a.     Chestatee agreed to "accept [BCBS Georgia's payments], as payment in full for Covered Services."  (Ex. B at ¶ 5.2).

b.    Chestatee agreed that its "charges for Covered Services *rendered* to Members" would not exceed its regular billed charges made to non-members for the same services.  (Ex. B at ¶ 5.3 (emphasis added)).

c.    Chestatee agreed to provide, upon request, "all information reasonably required [by BCBS Georgia], . . . including, but not limited to, complete and accurate descriptions of health care services performed and charges made, with diagnoses and procedure codes approved [by BCBS Georgia]."  (Ex. B at ¶ 5.5).

d.    Chestatee agreed to use its best efforts to submit all bills for "Covered Services *provided to* Members within thirty (30) days after the services [were] rendered[.]"  (Ex. B at ¶ 5.10 (emphasis added)).

e.    Chestatee was obligated to maintain records on HMO members "receiving Covered Services at [Chestatee]."  (Ex. B at ¶ 8.1).

95.    Other terms of the HMO Contract include that Chestatee agreed that BCBS Georgia would be "permitted to recover from [Chestatee] . . . amounts paid by [BCBS Georgia] because of," among other things, "inaccurate payments, including, but not limited to, payments based upon erroneous or incomplete information provided by [Chestatee.]"  (Ex. B at ¶ 5.6).

96.     Chestatee agreed not to assign its "rights, duties or obligations of the [Contract]." (Ex. B at ¶ 14.2).

97.     Chestatee further agreed to "indemnify and hold [BCBS Georgia] harmless from any and all liability, loss, damage, claim or expense of any kind, *including costs and attorney's fees,* … which results from negligent or willful acts or omissions by [Chestatee], its agents or employees regarding the duties and obligations of [Chestatee] under [the HMO Contract.]" (Ex. B at ¶ 9.2 (emphasis added)).

98.     Further, Chestatee was required to maintain comprehensive general liability insurance, and such other insurance as would be necessary to insure Chestatee and its employees "against any and all claims for damages arising from the duties and obligations of [the HMO Contract.]" (Ex. B at ¶ 9.5).

99.     The HMO Contract provides that, in the event of a dispute that the parties cannot resolve, Chestatee and BCBS Georgia agree to submit the dispute to the BCBS Georgia's Board of Directors. (Ex. B at ¶ 11.2). However, there is no longer a standing BCBS Georgia-specific Board of Directors. In addition, the process would be futile, as it represents a non-binding resolution, and the BCBS Plans have no reason to believe that Chestatee will meaningfully participate in that process.

## THE PPO CONTRACT

100.    The PPO Contract also makes clear that BCBS Georgia contracted to reimburse Chestatee only for services *provided by* Chestatee.

101.    Indeed, the first substantive provision of the PPO Contract, which details Chestatee's responsibilities under the Contract, states that Chestatee "shall *provide* to PPO Covered Persons PPO Eligible Services which are Medically Necessary in accordance with [the PPO Contract], when such services are ordered by a licensed physician or other licensed health professional."  (Ex. C at ¶ 2.1 (emphasis added)).

102.    Similarly, the first provision of the PPO Contract addressing BCBS Georgia's responsibilities states that BCBS Georgia must compensate Chestatee for eligible services "which [Chestatee] *performs* for PPO Covered Persons pursuant to the provisions of [the PPO Contract]."  (Ex. C at ¶ 3.1 (emphasis added)).

103.    Other provisions of the Contract make abundantly clear that it was intended to cover only services provided by Chestatee, including that:

      a.    Chestatee agreed to "accept [BCBS Georgia's] payments, as provided in [the Contract], as payment in full for Eligible Services *provided to* PPO Covered Persons."  (Ex. D at ¶ 2.3 (emphasis added)).

25

b.      Chestatee agreed to allow BCBS Georgia to conduct hospital bill and utilization audits, and to "permit such other activities as are deemed necessary by [BCBS Georgia] to ensure correct payment to [Chestatee] for PPO Eligible Services *rendered* to PPO Covered Persons." (Ex. C at ¶ 2.11 (emphasis added)).

c.      Chestatee agreed that BCBS Georgia would "pay [Chestatee] *for the provision of* medically necessary and appropriate PPO Eligible Services rendered to PPO Covered Persons in accordance with the provisions of [the PPO Contract.]"  (Ex. C at ¶ 4.1 (emphasis added)).

d.      Chestatee agreed to use its best efforts to submit all bills for "Eligible Services *provided to* PPO Covered Persons within sixty (60) days after the services [were] rendered[.]"  (Ex. C at ¶ 4.11 (emphasis added)).

e.      BCBS Georgia explicitly reserved the right to "review any PPO claim for Medical Necessity, Appropriateness, and/or to determine that *services provided* are Eligible Services under the terms of the PPO Covered Person's Membership Agreement prior to payment."  (Ex. C at ¶ 5.7 (emphasis added)).

104.    Chestatee also explicitly agreed that BCBS Georgia would be "permitted to recover from [Chestatee] amounts due to [BCBS Georgia] because

of," among other things, "inaccurate payments including payments based upon erroneous or incomplete information provided by [Chestatee.]"  (Ex. C at ¶ 4.6).

105.   Similarly, BCBS Georgia's obligation to pay for claims was contingent upon Chestatee's bills being "accurate, complete, properly itemized and clearly for medically necessary and appropriate PPO Eligible Services." (Ex. C at ¶ 3.2).

106.   Chestatee agreed not to assign its "rights, duties or obligations of the [PPO Contract]," and that it would not subcontract the PPO Contract, or any portion thereof, without written consent from BCBS Georgia.  (Ex. C at ¶¶ 13.1-13.2).

107.   Chestatee further agreed to "indemnify and hold [BCBS Georgia] harmless from any and all liability, loss, damage, claim or expense of any kind, *including costs and attorney's fees*, … which results from negligent or willful acts or omissions by [Chestatee], its agents or employees regarding the duties and obligations of [Chestatee] under [the PPO Contract.]"  (Ex. C at ¶ 8.2 (emphasis added)).

108.   The PPO Contract further provides that, in the event of a dispute that the parties could not resolve, disputes between BCBS Georgia and Chestatee

are to be arbitrated.  No such provision governs BCBS Georgia's relationship with the remaining Defendants.

## SUMMARY OF THE BCBS PLANS' CLAIMS

109.   Since August 2016, Chestatee has inappropriately billed BCBS Georgia more than $174 million for the laboratory claims at issue in this lawsuit, causing the BCBS Plans to reimburse Chestatee approximately $111 million.

110.    Under the HMO Contract, Chestatee inappropriately billed BCBS Georgia approximately $3 million, causing the BCBS Plans to reimburse Chestatee approximately $1.9 million.  Through this lawsuit, the BCBS Plans seek recovery of this entire amount from all Defendants.

111.    Under the PAR Contract, Chestatee inappropriately billed BCBS Georgia approximately $7.4 million, causing the BCBS Plans to reimburse Chestatee approximately $5.6 million.  Through this lawsuit, the BCBS Plans seek recovery of this entire amount from all Defendants.

112.    Under the PPO Contract, Chestatee inappropriately billed BCBS Georgia approximately $164 million, causing the BCBS Plans to reimburse Chestatee approximately $103 million.  Through this lawsuit, the BCBS Plans seek recovery of this entire amount from all Defendants, although the portion of the dispute between BCBS Georgia and Chestatee must be arbitrated.

# FACTUAL BACKGROUND

## URINE DRUG TESTING

113.    Drug tests are laboratory analyses used to aid in the detection of prescription, recreational, or illicit substances in human specimens.  Drug testing may be used to meet state requirements, evaluate therapeutic compliance and drug aberrant behavior (*e.g.*, abuse or diversion), or to evaluate for child and elder abuse.  It can include analysis for most drugs, chemicals, and/or plant products that are known to be misused, including for recreational use.

114.    Although drug tests may be performed on a variety of specimen types, UDT is the most commonly used because it is widely available, minimally invasive, and generally the least expensive for drug detection and monitoring.

115.    This is consistent with Anthem's Clinical UM Guideline, entitled "Drug Testing or Screening in the Context of Substance Use Disorder and Chronic Pain" (the "Anthem Drug Testing Policy") which states that "the use of blood samples as an alternative to urine for drug testing is considered medically necessary when the use of urine is not feasible[.]"

116.    UDT falls into two categories of testing: presumptive and definitive.

117.    Presumptive testing is used, when medically necessary, to determine the presence or absence of one or more drugs or drug classes.

Presumptive testing is typically performed via immunoassay, and results are expressed as negative, positive, or numeric.  It is also referred to as "screening" or "qualitative" testing.

118.   Definitive testing is a follow-up test performed on a separate portion of the original specimen, when medically necessary, to validate the identity and quantity of a specific drug or metabolite.  Definitive testing is typically performed using either gas chromatography-mass spectrometry or liquid chromatography-mass spectrometry, and results are expressed as a concentration of a particular metabolite or analyte (*e.g.*, nanograms per milliliter (ng/mL)).  It is also referred to as "confirmation" or "quantitative" testing.

119.   Definitive testing is typically reasonable and necessary only in certain circumstances.

120.   The Anthem Drug Testing Policy states that definitive testing is medically necessary only when all of the following criteria are met:

    a.   the presumptive UDT was done for a medically necessary reason; and

    b.   the presumptive test was negative for prescribed medications, positive for a prescription drug with abuse potential which was not

prescribed, or positive for an illegal drug (for example, but not limited to, methamphetamine or cocaine), and

      i.     the specific definitive test(s) ordered are supported by documentation specifying the rationale for each [definitive] test ordered, and

      ii.     clinical documentation reflects how the result of the test(s) will be used to guide clinical care.

## THE TOXICOLOGY LABORATORY INDUSTRY

121.    In recent years, government enforcement, private lawsuits, and investigative journalism have helped identify widespread fraud within the toxicology laboratory industry.

122.    For example, in a November 2014 article about the massive increases in the amount of UDT being paid for by Medicare, the Wall Street Journal summarized the then-recent history of the industry:

> Spending on the [urine drug] tests took off after Medicare cracked down on what appeared to be abusive billing for simple urine tests. Some doctors moved on to high-tech testing methods, for which billing wasn't limited.
>
> They started testing for a host of different drugs— including illegal ones that few seniors ever use—and

> billing the federal health program for the elderly and disabled separately for each substance.
>
> Medicare's spending on 22 high-tech tests for drugs of abuse hit $445 million in 2012, up 1,423% in five years.[3]

123.   In another example, in October 2015, the former Millennium Laboratories agreed to pay $256 million to the U.S. Department of Justice to resolve allegations that it billed Medicare "many millions of dollars' worth" of UDT claims that were "not reasonable and necessary or that were furnished pursuant to prohibited referrals" in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and other statutes.

124.   Because of concerns about the frequency, cost, and manner with which toxicology laboratories were billing payors, a number of changes were put into place as to how laboratories test and bill for UDT.

125.   For example, the Centers for Medicare and Medicaid Services ("CMS") changed the way that UDT is billed, in part because of a "concern about the potential for overpayment when billing for each individual drug test rather than a single code that pays the same amount regardless of the number of drugs that are being tested."

---

[3]   Christopher Weaver and Anna Wilde Mathews, *Doctors Cash In on Drug Tests for Seniors, and Medicare Pays the Bill*, THE WALL STREET JOURNAL, Nov. 10, 2014 (available at: https://www.wsj.com/articles/doctors-cash-in-on-drug-tests-for-seniors-and-medicare-pays-the-bill-1415676782).

126.   Because these changes have decreased the rate at which toxicology laboratories are reimbursed for UDT, many laboratories have sought out other ways to access more favorable reimbursement rates, including—as here—passing their claims through hospitals to take advantage of the hospitals' participating status and favorable reimbursement rates with payors.

127.   Indeed, the website of one entity that recruited toxicology laboratories to pass their claims through a different network of pass-through hospitals makes clear the motives of the arrangement:

## Why Hospital Out-Patient Diagnostic Billing?

The Government is continuing to restrict independent clinical labs due to recurring compliance and quality issues. Payers are strategically making moves to block all but a chosen few clinical labs by restricting in-network access. This forces out-of-network labs to strategically align themselves with health systems in order to have a seat at the table. Additionally, patients, clinics, rehab groups, and MDs prefer working with higher quality lab system than their current choices dictate; That's where you come in...

## Benefits of being a Preferred Partner



- 90% adjudication rate
- 50% of claims within 30 days
- Get paid a minimum of $500/specimen



- Work with the top health systems in the country
- Above average reimbursement



- Free state-of-the-art specimen tracking system
- In-Network status for 90+% of claims

128.    In other words, because of "recurring compliance and quality issues," CMS and commercial payors restricted certain laboratories from their networks.  This led some of the remaining laboratories—including those who were restricted from payors' networks for compliance and quality issues—to use hospitals like Chestatee Regional Hospital to hide the true identity of the laboratory performing the UDT, and take advantage of the hospitals' participating status and favorable reimbursement agreements with payors.

34

## THE DEFENDANTS' PASS-THROUGH BILLING SCHEME

129.    Durall Capital purchased Chestatee Regional Hospital in August 2016.

130.    Around the same time, Aaron Durall (individually or through Durall Capital) engaged Jorge Perez to manage Chestatee's finances and help oversee the scheme.

131.    Jorge Perez owns or manages, indirectly, a number of other small hospitals, through which he has engaged in similar schemes.

132.    Jorge Perez and Aaron Durall previously conspired to implement at least one other known pass-through billing scheme, at Campbellton-Graceville Hospital in Graceville, Florida.  There, Perez served as Campbellton-Graceville's CEO after it was acquired by The People's Choice Hospital, LLC.[4]  At the direction of Aaron Durall, Reliance Labs performed laboratory tests at Reliance Labs that were improperly billed to insurers as if performed at and by Campbellton-Graceville Hospital. Through the Campbellton-Graceville scheme, Reliance Labs received approximately $25,000,000 in improper reimbursements.

---

[4]    People's Choice is itself the defendant in separate actions arising from yet more fraudulent billing schemes. One arose due to its relationship with the Campbellton-Graceville Hospital.  *See Campbellton-Graceville Hosp. Corp. v. Peoples Choice Hosp.*, No. 5:16-cv-00222 (N.D. Fla. filed Aug. 3, 2016).  Another scheme was perpetrated in Oklahoma.  *See Aetna Inc. v. The People's Choice Hosp., LLC*, No. 2:17-cv-04354 (E.D. Pa. filed Sept. 29, 2017) (recently transferred to the Western District of Texas).

133.    Jorge Perez is also vice president of Hospital Partners, Inc., which implemented a scheme in Missouri similar to the one alleged herein.  That arrangement was the subject of an audit by the State Auditor of Missouri, who described it as a "billing scheme" whereby the hospital was "reduc[ed] to what is essentially a shell organization for labs across the country."[5]

134.    Immediately after Durall Capital acquired Chestatee Regional Hospital, it began billing BCBS Georgia for high volumes of UDT.

135.    As described herein, Chestatee and Reliance Labs agreed to camouflage laboratory claims from Reliance Labs so that BCBS Georgia would be more likely to pay them, and would pay them at the rates that Chestatee was entitled to under the HMO, PAR, and PPO Contracts, which were substantially higher than the rates that Reliance Labs would have received had it billed the claims directly to BCBS Georgia.

---

[5]    The State Auditor's report, which is incorporated herein, is accessible via the following link: https://www.auditor.mo.gov/content/auditor-galloway-uncovers-evidence-90-million-billing-scheme-putnam-county-memorial-hospital (last visited Feb. 22, 2018).  The State Auditor's press release announcing its findings is available via the following link: https://auditor.mo.gov/content/auditor-galloway-uncovers-evidence-90-million-billing-scheme-putnam-county-memorial-hospital (last visited Feb. 22, 2018).

136.    Aaron Durall directed the scheme in his capacity as CEO of Chestatee Regional Hospital, President of Reliance Labs, and Manager of DL Investment Holdings, LLC.

137.    In exchange, Defendants split the proceeds, which were substantially greater than what each party would have received if they had billed BCBS Georgia only for the tests that they each actually performed, and at the rates to which they were individually entitled.

138.    To increase the revenues that they could generate from the pass-through scheme, Defendants relied upon a network of referring healthcare providers who ordered large volumes of laboratory testing (including pain clinics and drug detoxification or rehabilitation facilities).

139.    To ensure that Chestatee received the specimens referred by these healthcare providers and laboratories, Reliance Labs paid them kickbacks by, for example, promising them a portion of the reimbursement that Chestatee received for each test, including from the BCBS Plans.

140.    Once ordered by a referring healthcare provider, the tests were conducted at and by Reliance Labs.

141.    After the specimens were tested by Reliance Labs, they were sometimes sent to Chestatee Regional Hospital's on-site laboratory for further

testing.  However, upon information and belief, that testing was not medically necessary and provided no additional clinically useful information.

142.   Upon information and belief, Aaron Durall instructed personnel at Chestatee Regional Hospital's on-site laboratory to destroy the lab results created by the laboratory equipment there, apparently to avoid creating documentary proof of which tests were conducted on-site (as opposed to at Reliance Labs).

143.   Upon information and belief, one reason for this instruction was that the equipment at Chestatee Regional Hospital's on-site laboratory was only capable of testing in panels of eight or fewer drugs or metabolites.  However, Chestatee billed BCBS Georgia for panels of up to 24 drugs or metabolites.

144.   Billing for the scheme was performed at the Florida offices of Medivance, under the direction of Neisha Carter Zaffuto, and in accordance with the Defendants' collective agreement.

145.   The claims were submitted to BCBS Georgia by Medivance, on behalf of Chestatee, as if the testing was performed at and by Chestatee and was reimbursable under the HMO, PAR, and PPO Contracts.

146.   Chestatee, Medivance, Reliance Labs, Aaron Durall, Jorge Perez, and Neisha Carter Zaffuto agreed to submit the claims in this manner, and each took

the overt acts described herein to facilitate the submission of these claims to BCBS Georgia.

147.    To facilitate the scheme, Chestatee, Medivance, Reliance Labs, Aaron Durall, Jorge Perez, and Neisha Carter Zaffuto sought to hide from BCBS Georgia the identity of the laboratory actually performing the testing.

148.    Indeed, had Defendants disclosed the entity actually performing the testing (i.e., a non-participating toxicology laboratory such as Reliance Labs), the BCBS Plans would not have paid the claims at issue or would have paid them at substantially lower rates.

149.    Defendants conspired to restrict Chestatee Regional Hospital's on-site billing staff from accessing information about the fraudulent claims.

150.    Upon information and belief, mail sent to Chestatee was forwarded unopened to Aaron Durall or Neisha Carter Zaffuto, who facilitated the scheme from Florida.  Once the mail was reviewed in Florida, select communications that would not reveal the existence of the scheme were returned to Chestatee Regional Hospital in Georgia.

151.    The claims submitted to BCBS Georgia contained numerous material misrepresentations intended to hide the fact that the UDT was not performed at

Chestatee, by Chestatee-credentialed healthcare providers, or for the BCBS Plans' members present in the service area covered by Chestatee.

152.    The misrepresentations include, but are not limited to:

    a.    provider name (misrepresented as Chestatee);

    b.    provider street address (misrepresented as Chestatee);

    c.    provider Tax ID and National Provider Identifier ("NPI") (misrepresented as Chestatee);

    d.    type of bill (misrepresented as 141, which represents a specimen submitted for analysis to a hospital);

    e.    admission type (misrepresented as "urgent" admission when no patient was ever admitted at Chestatee Regional Hospital);

    f.    source of admission (misrepresented as "information not available," when there was no admission).

    g.    patient discharge status (misrepresented as a patient discharged to home or self-care, when there was no admission or discharge); and

    h.    attending physician and attending physician's NPI (misrepresented as the provider purportedly ordering the UDT).

153.    When they submitted claims to BCBS Georgia, Chestatee,

Medivance, Reliance Labs, Aaron Durall, Jorge Perez, and Neisha Carter Zaffuto

falsely certified on each claim that the billing information was "true, accurate,

and complete[.]"

154.    Similarly, on each claim, these Defendants falsely certified that they

"did not knowingly or recklessly disregard or misrepresent or conceal material

facts."

155.    The claim form also contains a notice that the submitter of the form

"understands that misrepresentation or falsification of essential information as

requested by this form, may serve as the basis for civil monetary penalties and

assessments and may upon conviction include fines and/or imprisonment under

federal and/or state laws."

156.    BCBS Georgia reasonably relied on the material misrepresentations

contained on Chestatee's claims in deciding to pay the claims.

157.    Once Chestatee received payment from BCBS Georgia, Chestatee

shared the proceeds with the other Defendants.

158.    Upon information and belief, written contracts between the

Defendants identify the amount that each Defendant was entitled to in exchange

for its participation in this fraudulent scheme.

159.   From the payments made by BCBS Georgia, employees or agents of Reliance Labs paid kickbacks to healthcare providers who referred their patients' urine and blood specimens to be used in the scheme.

160.   Upon information and belief, Durall Capital and Aaron Durall purchased Chestatee Regional specifically to perpetrate this pass-through scheme.

161.   Upon information and belief, Jorge Perez provided, directly or indirectly, financial support necessary for Durall Capital and Aaron Durall to purchase Chestatee Regional Hospital, with the expectation that the hospital would be used to perpetrate this pass-through scheme.

### DEFENDANTS BEGIN TO ROUTE CLAIMS THROUGH CHESTATEE

162.   Before Durall Capital's acquisition of Chestatee Regional Hospital, Reliance Labs billed BCBS Georgia directly for UDT that it purportedly performed for the BCBS Plans' members.

163.   But, within one month of Durall Capital's acquisition of the hospital, BCBS Georgia began receiving claims from both Reliance Labs and Chestatee for testing performed for the same BCBS Plans' members.

164.    For example, over the course of two months, Reliance Labs and Chestatee billed BCBS Georgia for 25 urine drug tests for one BCBS Plan member located in St. Louis, Missouri.

165.    Those tests were billed to BCBS Georgia as follows:

| No. | Date | Billed By | No. | Date | Billed By |
|---|---|---|---|---|---|
| 1 | 8-19-2016 | Reliance Labs | 14 | 9-14-2016 | Chestatee Regional |
| 2 | 8-21-2016 | Reliance Labs | 15 | 9-16-2016 | Reliance Labs |
| 3 | 8-23-2016 | Reliance Labs | 16 | 9-18-2016 | Reliance Labs |
| 4 | 8-25-2016 | Reliance Labs | 17 | 9-20-2016 | Reliance Labs |
| 5 | 8-27-2016 | Reliance Labs | 18 | 9-23-2016 | Chestatee Regional |
| 6 | 8-29-2016 | Reliance Labs | 19 | 9-24-2016 | Reliance Labs |
| 7 | 8-31-2016 | Reliance Labs | 20 | 9-26-2016 | Reliance Labs |
| 8 | 9-02-2016 | Reliance Labs | 21 | 9-26-2016 | Chestatee Regional |
| 9 | 9-04-2016 | Reliance Labs | 22 | 9-28-2016 | Reliance Labs |
| 10 | 9-06-2016 | Reliance Labs | 23 | 10-03-2016 | Chestatee Regional |
| 11 | 9-08-2016 | Reliance Labs | 24 | 10-05-2016 | Chestatee Regional |
| 12 | 9-10-2016 | Reliance Labs | 25 | 10-08-2016 | Reliance Labs |
| 13 | 9-12-2016 | Reliance Labs | | | |

166.    This pattern—where UDT for a single member was billed by both Chestatee and Reliance Labs during the same period—was typical in the months following Durall Capital's acquisition of Chestatee.

167.    Upon information and belief, the facility performing the UDT for the BCBS Plans' members was Reliance Labs.

168.    Over time, more UDT was billed to BCBS Georgia by Chestatee, and less was billed to BCBS Georgia by Reliance Labs, to exploit Chestatee's in-network contract with BCBS Georgia and maximize reimbursements.

169.    This transition toward billing the tests through Chestatee was extremely lucrative for the Defendants.  When Reliance Labs billed BCBS Georgia directly, BCBS Georgia typically paid between $100 and $300 per specimen tested.  On the other hand, when the testing was billed through Chestatee, BCBS Georgia typically paid in excess of $1,400 per specimen tested.

**DEFENDANTS' EFFORTS TO DISRUPT BCBS GEORGIA'S INVESTIGATION**

170.    In April 2017, BCBS Georgia received a complaint from a member located in West Virginia, who was surprised by a bill for testing purportedly performed by Chestatee.

171.    In response, a BCBS Georgia representative spoke by phone with a Chestatee Regional Hospital employee, who had been employed at the hospital since before Durall Capital acquired it.

172.    On the call, the employee reported that claims were being billed by Chestatee for patients who were never seen at the hospital, and that the records for these patients were maintained in Florida, not at the hospital in Georgia.

44

173.    The employee further stated that she advised Aaron Durall that Chestatee could not bill for services that were not performed at or by Chestatee. Aaron Durall assured her that the hospital's billing was appropriate.

174.    The employee believed that since Durall Capital acquired the hospital, insurers had paid Chestatee millions of dollars for testing that was not performed by the hospital and was not reimbursable.

175.    As permitted by its Contract, BCBS Georgia sent a request to Chestatee for all records relating to a sample of UDT claims billed to the plan.

176.    Chestatee provided only a fraction of the records requested.

177.    When a BCBS Georgia investigator contacted Chestatee Regional Hospital's on-site laboratory to ask follow-up questions about the production, the hospital's on-site laboratory director stated that she was unaware of BCBS Georgia's request for records.

178.    The BCBS Georgia investigator agreed to fax the records he had received to Chestatee Regional Hospital's on-site laboratory director.

179.    Around the same time, the BCBS Georgia investigator received multiple calls from Neisha Carter Zaffuto (from a number with a Florida area code), requesting that he direct his questions to her, rather than to the hospital's on-site laboratory director.

45

180. After reviewing the records from the BCBS Georgia investigator, Chestatee Regional Hospital's on-site laboratory director spoke with Jaquanda Smith, Chestatee's "Director of Operations/HIM."

181. Among other things, the on-site laboratory director informed Jaquanda Smith that the test results identified by BCBS Georgia were for panels of up to 24 drugs or metabolites, which the on-site laboratory director knew could not have been performed at Chestatee Regional's on-site laboratory.

182. Jaquanda Smith told the on-site laboratory director that she would respond to BCBS Georgia, and that the on-site laboratory director should not discuss the matter with anyone else.

183. Jaquanda Smith then wrote to the BCBS Georgia investigator: "Chestatee Regional Hospital completed and generated reports for all the tests you inquired about."

184. In response to further questioning from the BCBS Georgia investigator, Jaquanda Smith added: "I am affirming that the testing results were completed at chestatee [*sic*]."

185. At the time that Jaquanda Smith made these statements, in her capacity as an employee of Chestatee, she knew that they were false, and made them with the intent to further the fraudulent scheme described herein.

186.    One employee of Chestatee Regional Hospital also stated that, because Chestatee was concerned that payors would conduct inspections of Chestatee Regional Hospital's on-site laboratory, Chestatee was rushing to install a machine capable of testing panels of up to 24 drugs or metabolites.

187.    On April 12, 2017, the BCBS Georgia investigator sent a letter to Aaron Durall summarizing BCBS Georgia's analysis of the sample claims and the records provided by Chestatee in support of the sample claims.

188.    The findings summarized included the following:

a.    much of the UDT billed by Chestatee was not medically necessary;

b.    many tests were performed based upon standing orders that were either signed or stamped blank prescriptions;

c.    definitive tests were frequently billed as presumptive tests;

d.    the majority of the BCBS Plans' members were tested at excessive frequencies (often more than 24 times per calendar year);

e.    the frequency of testing was often too frequent (i.e., near daily) to allow for meaningful use of the tests in medical decision-making, as additional tests were often ordered before the healthcare providers received the results of the previous tests;

  f.  many members of the BCBS Plans had UDT billed by both Reliance Labs and Chestatee and, when taking that volume into account, the frequency with which members of the BCBS Plans were tested was even more excessive;

  g.  in some cases, the "client" field on the test results identified other laboratories for UDT purportedly performed by Chestatee;

  h.  Chestatee employees reported that they were not permitted to talk to the BCBS Georgia investigator or cooperate with his requests; and

  i.  the medical records provided by Chestatee in response to the BCBS Georgia investigator's request were prepared and submitted by persons in Florida, and did not appear to be from Chestatee Regional Hospital.

189. Even after being notified of the serious misrepresentations being made in the claims submitted to BCBS Georgia, Defendants continued to execute their scheme.

190. In November 2017, in an effort to deter the fraudulent billing scheme by reducing the financial incentives motivating the conduct, BCBS Georgia amended its HMO, PAR, and PPO Contracts with Chestatee by adding a Lab Fee Schedule that set specific prices that BCBS Georgia would pay Chestatee for

laboratory testing, including UDT and BDT.  True and correct copies of the Lab

Fee Schedules are included in Exhibits A-C.

191.    The Lab Fee Schedules listed laboratory codes and the rates that

BCBS Georgia would pay Chestatee for each service.

192.    For any laboratory codes not listed on the Lab Fee Schedule, the

parties agreed that they would "price at $0.00."

193.    In response, Defendants changed the way that they billed BCBS

Georgia for UDT in order to conceal from BCBS Georgia the claims that were

laboratory-related.

194.    Prior to the implementation of the Lab Fee Schedule, Defendants

would submit claims using CPT and HCPCS[6] codes that identified the bills as

laboratory-related.  After the implementation of the Lab Fee Schedule,

Defendants began submitting claims without these CPT or HCPCS codes, and

instead used only revenue codes, in an effort to hide the fact that the bills were

for laboratory-related services.

---

[6]  "CPT" stands for "Current Procedural Terminology," and is a medical code
set that is used to report medical, surgical, and diagnostic procedures and
services to entities such as physicians, health insurance companies and
accreditation organizations. "HCPCS" stands for "Healthcare Common
Procedure Coding System" and is a code set used by Medicare and health
insurance providers to standardize billing.

**SAMPLE CLAIMS**

195.     As described above, BCBS Georgia requested that Chestatee provide medical records, "including all testing results, requisition forms, provider medical records and all supporting documentation" for a sample of the claims at issue.

196.     From that documentation, the BCBS Plans have identified the following claims as illustrative of Defendants' scheme.

**SAMPLE CLAIM SET #1**

197.     On October 5, 2016, a doctor of osteopathic medicine affiliated with a detoxification and rehabilitation facility in Costa Mesa, California completed a "Standing Order" form for a BCBS Georgia member.  That BCBS Plan member is referred to herein as Member #1.

198.     BCBS Georgia was billed four times by Chestatee for UDT collected from Member #1 even before the Standing Order was signed.  Chestatee failed to provide an order form for any of these four tests.

199.     The Standing Order identifies Member #1's name, date of birth, and the date the Standing Order was completed.  A section of the form where the treating provider was to list Member #1's prescriptions is blank.  In the section entitled "Dx," where the treating provider was to provide a diagnosis, a notation

states "3x a week."  Upon information and belief, this indicates that Member #1 was to be subjected to UDT three times per week.  Finally, the Standing Order was stamped with the treating provider's signature, rather than being signed.

200.    The first UDT results provided by Chestatee are for a specimen collected from Member #1 on October 5, 2016.

201.    Those results have Chestatee's logo, name, and address across the top of their first page.  The field for Chestatee's phone number is blank.

202.    On the test results, the laboratory director identified as responsible for the tests is "Mills Brinson III, CLD."

203.     However, when contacted by BCBS Georgia, Brinson denied ever being affiliated with Chestatee.  He similarly denied being a lab director for Reliance Labs.

204.    However, Brinson stated that he was once the lab Director for Regional General Hospital in Williston, Florida.

205.    Regional General Hospital was purchased by LifeBrite Hospital Group in 2016.  Jorge Perez is a Director of LifeBrite Hospital Group.

206.    The test result form states that Member #1 was prescribed Metoprolol, a beta-blocker, yet the Standing Order includes no such notation.

207.   The test result form also states that the treating provider ordered "CRH_FSCR FULL SCREEN" and "FSCR FULL SCREEN," yet no such order was produced by Chestatee.

208.    The test result form also includes the following diagnoses for Member #1: (a) F19.20 – Other psychoactive substance d; (b) F11.20 – Opioid dependence; and (c) F15.20 – Other stimulant dependence.  Yet, the Standing Order completed by the treating provider included none of these diagnoses.

209.   The test result form also includes a space for Member #1 to "consent and agree" to provide his urine specimen "to the facility designated by [his] doctor as described above."  However, none of the test result forms provided by Chestatee were signed by Member #1.  Further, the form containing this waiver appears to have been created three days after the urine was collected from Member #1, and purports to have been created at Chestatee, thousands of miles away from the rehabilitation facility at which Member #1 was receiving treatment.

210.   Member #1's urine specimen was purportedly subjected to presumptive testing for 24 drug classes, all of which tested negative (i.e., not present).

211.    Upon information and belief, these tests were performed at Reliance Labs.

212.    Yet, Chestatee billed BCBS Georgia, or caused BCBS Georgia to be billed, for the testing on a claim that misrepresented, among other things, the:

a.    provider (misrepresented as Chestatee);

b.    provider's street address (misrepresented as Chestatee);

c.    provider's Tax ID and NPI (misrepresented as Chestatee);

d.    type of bill (misrepresented as "141," which represents a specimen submitted for analysis to a hospital);

e.    admission type (misrepresented as "2," which stands for "urgent" admission, when there was no admission);

f.    source of admission (misrepresented as "9," which stands for "information not available," when there was no admission);

g.    patient discharge status (misrepresented as "01," which represents a patient discharged to home or self-care, when there was no admission or discharge); and

h.    attending physician and attending physician's NPI (misrepresented the referring provider as an attending physician).

213.    The testing was billed to BCBS Georgia using one count of HCPCS code G0479, for which Chestatee charged $2,700.

214.    BCBS Georgia allowed $1,792.31 based on the reimbursement guidelines set forth in the PPO Contract.  Member #1 owed no copay or coinsurance, so BCBS Georgia paid Chestatee $1,792.31 for the test.

215.    Member #1 was not a Chestatee patient, was not treated by a Chestatee-credentialed healthcare provider, and resided thousands of miles from Chestatee Regional Hospital.

216.    But for Defendants' scheme, Chestatee would not have submitted a claim for this testing to BCBS Georgia and BCBS Georgia would not have paid anything to Chestatee for the service.

217.    Between September 2016 and August 2017, Chestatee billed BCBS Georgia for 88 urine drug tests for Member #1 that were substantially similar to the one described in Paragraphs 195 through 215, above.

218.    In reliance on those 88 fraudulent claims, BCBS Georgia paid Chestatee more than $155,000.

**SAMPLE CLAIM SET #2**

219.    On September 22, 2016, a doctor affiliated with a sober living and intensive outpatient treatment program in Houston, Texas digitally signed a medical record for a BCBS Plan member.

220.    That BCBS Plan member is referred to herein as Member #2.

221.    Aside from providing basic biographical data, the treating provider's notes state only that he "reviewed psychosocial history and recommend patient comply with the company policy of 3 UA's/week."

222.    Upon information and belief, "UA" refers to urinalysis, or UDT.

223.    According to the records provided by Chestatee, the treating provider made identical notations in Member #2's medical record on October 21, 2016, November 23, 2016, and December 22, 2016.

224.    In his notation on January 10, 2017, the treating provider purportedly changed his notation slightly, to read, "have reviewed treatment plan and recommend client comply with the company policy of 3 UA's/week."

225.     The first UDT results provided by Chestatee for Member #2 are for a specimen collected from him on October 2, 2016.

226.    The test results have Chestatee's logo, name, and address across the top of their first page.  The field for Chestatee's phone number is left blank.

227.    As with Sample Claim Set #1, the test results identify Mills Brinson

III, CLD as the lab Director responsible for the tests.  Yet, Brinson denies ever

being affiliated with Chestatee or Reliance Labs.

228.    However, Brinson stated that he was once the lab director for

Regional General Hospital in Williston, Florida, which was purchased by

LifeBrite Hospital Group in 2016.  Jorge Perez is a Director of LifeBrite Hospital

Group

229.    The test result form states that the referring provider ordered

"CHR_FSCR FULL SCREEN" and "SCRN FSCR W/O CONTININE," yet no

such order was produced by Chestatee.

230.    The test result form states that Member #2's treating provider

diagnosed Member #2 with "F19.20 – Other psychoactive substance d [*sic*]."  Yet,

Chestatee provided no documentation showing that the treating provider

rendered this diagnosis.

231.     The test result form also includes a space for Member #2 to "consent

and agree" to provide his urine specimen "to the facility designated by [his]

doctor as described above."  However, the forms use an identical digital

signature or are unsigned.  In addition, the forms containing the waiver appear

to have been created days after each specimen was collected from Member #2,

and purportedly were created at Chestatee, hundreds of miles from the facility where Member #2 received treatment.

232.   The urine specimen taken from Member #2 was purportedly subjected to presumptive testing.

233.   Upon information and belief, these tests were performed at Reliance Labs.

234.   Yet, Defendants billed BCBS Georgia, or caused BCBS Georgia to be billed, for the testing on a claim that misrepresented, among other things:

      a.      provider (misrepresented as Chestatee);

      b.      provider street address (misrepresented as Chestatee);

      c.      provider Tax ID and NPI(misrepresented as Chestatee);

      d.      type of bill (misrepresented as "141," which represents a specimen submitted for analysis to a hospital);

      e.      admission type (misrepresented as "2," which stands for "urgent" admission, when there was no admission);

      f.      source of admission (misrepresented as "9," which stands for "information not available," when there was no admission);

g.      patient discharge status (misrepresented as "01," which represents a patient discharged to home or self care, when there was no discharge); and

h.      attending physician and attending physician's NPI (misrepresented the treating provider as an attending physician).

235.    The testing was billed to BCBS Georgia using one count of HCPCS code G0479, for which Chestatee charged $2,700.

236.    In accordance with the PPO Contract, BCBS Georgia allowed $1,792.31.  Member #2 owed no copay or coinsurance, so BCBS Georgia paid Chestatee $1,792.31.

237.    Member #2 was not a Chestatee patient, was not treated by a Chestatee-credentialed healthcare provider, and resided thousands of miles from Chestatee.

238.    But for Defendants' scheme, Chestatee would not have submitted a claim for this testing to BCBS Georgia and BCBS Georgia would not have paid anything to Chestatee for the service.

239.    Between October 2016 and February 2017, Chestatee billed BCBS Georgia for 65 urine drug tests for Member #2 that were substantially similar to the one described in Paragraphs 219 through 238, above.

240.     In reliance on those 65 fraudulent claims, BCBS Georgia paid

Chestatee more than $104,000.

## CAUSES OF ACTION

### COUNT I
### BREACH OF PAR CONTRACT
### (Against Chestatee)

241.     The BCBS Plans incorporate by reference all preceding paragraphs

as if fully set forth herein and further allege as follows:

242.     BCBS Georgia has a contractual relationship with Chestatee, as

defined by the PAR Contract and all materials referenced or incorporated

therein.

243.     BCBS Georgia performed its obligations under the PAR Contract,

and all conditions precedent have been satisfied.

244.     Chestatee materially breached the PAR Contract, including by:

a.      Submitting claims to BCBS Georgia, or causing claims to be

submitted to BCBS Georgia, for services not performed by Chestatee.  (*See*,

*e.g.*, Ex. A at ¶¶ 4.1, 4.2, 4.5, 4.7, 5.1 6.1, 6.2, 6.4, 6.6, 6.10, 7.4, 8.1, 13.1, 13.2).

b.      Assigning its rights, duties, and/or obligations under the

Contract, in whole or in part, to Reliance Labs, in violation of the Contract.

(*See* Ex. A at ¶ 13.1).

   c. Subcontracting its responsibilities to Reliance Labs, in violation of the Contract.  (*See* Ex. A at ¶ 13.2).

   d. Submitting claims to BCBS Georgia, or causing claims to be submitted to BCBS Georgia, that Chestatee knew were not accurate, complete, and truthful, including but not limited to claims containing the following misrepresentations:

    i. provider name;

    ii. provider street address;

    iii. provider Tax ID and NPI;

    iv. type of bill;

    v. admission type;

    vi. source of admission;

    vii. patient discharge status;

    viii. attending physician and NPI; and

    ix. identity of the lab director.

(*See*, *e.g.,* Ex. A at ¶ 5.4).

   e. Submitting claims to BCBS Georgia for medically unnecessary UDT.  (Ex. A at ¶ 4.1).

245.    As a direct and proximate consequence of Chestatee's material breaches of the PAR Contract, the BCBS Plans have suffered damages.

246.    Therefore, the BCBS Plans seek to recover, at a minimum, the amount paid on the improper claims that Chestatee submitted or caused to be submitted to BCBS Georgia.

**COUNT II**
**BREACH OF HMO CONTRACT**
**(Against Chestatee)**

247.    The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

248.    BCBS Georgia has a contractual relationship with Chestatee, as defined by the HMO Contract and all materials referenced or incorporated therein.

249.    BCBS Georgia performed its obligations under the HMO Contract, and all conditions precedent have been satisfied.

250.    Chestatee materially breached the HMO Contract, including by:

a.    Submitting claims to BCBS Georgia, or causing claims to be submitted to BCBS Georgia, for services not performed at or by Chestatee. (*See, e.g.*, Ex. B at ¶¶ 3.1, 3.3, 3.5, 3.6, 3.10, 3.11, 3.15, 4.1, 5.1, 5.3, 5.4, 5.5, 5.6, 5.11, 6.1, 7.1).

b.      Assigning its rights, duties, and obligations under the HMO

Contract, in whole or in part, to Reliance Labs.  (*See* Ex. B at ¶ 14.2).

c.      Submitting claims to BCBS Georgia, or causing claims to be

submitted to BCBS Georgia, that Chestatee knew were not accurate,

complete, and truthful, including but not limited to claims containing the

following misrepresentations:

> i.   provider name;
>
> ii.   provider street address;
>
> iii.   provider Tax ID and NPI;
>
> iv.   type of bill;
>
> v.   admission type;
>
> vi.   source of admission;
>
> vii.   patient discharge status;
>
> viii.   attending physician and NPI; and
>
> ix.   the identity of the laboratory director

(*See*, *e.g.,* Ex. B at ¶ 5.6).

d.      Submitting claims to BCBS Georgia for medically

unnecessary UDT.  (Ex. B at ¶ 3.1).

251.     As a direct and proximate consequence of Chestatee's material breaches of the HMO Contract, the BCBS Plans have suffered damages.

252.     Therefore, the BCBS Plans seek to recover, at a minimum, the amount paid on the improper claims that Chestatee submitted or caused to be submitted to BCBS Georgia.

**COUNT III**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**FOR THE PAR CONTRACT**
**(Against Chestatee)**

253.     The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

254.     Every contract implies a covenant of good faith and fair dealing in the contract's performance and enforcement.

255.     BCBS Georgia has a contractual relationship with Chestatee, as defined by the PAR Contract and all materials referenced or incorporated therein.

256.     Chestatee violated the implied covenant of good faith and fair dealing by performing the acts described herein, including but not limited to, by fraudulently billing BCBS Georgia for laboratory testing performed at and by Reliance Labs as if it had been performed at and by Chestatee.

257.   In so doing, Chestatee failed to diligently and in good faith seek to comply with all portions of the terms of the PAR Contract.

258.   As a direct and proximate consequence of Chestatee's breach of the covenant of good faith and fair dealing, the BCBS Plans have suffered damages in an amount to be determined at trial.

<u>COUNT IV</u>
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING FOR THE HMO CONTRACT**
**(Against Chestatee)**

259.   The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

260.   Every contract implies a covenant of good faith and fair dealing in the contract's performance and enforcement.

261.   BCBS Georgia has a contractual relationship with Chestatee, as defined by the HMO Contract and all materials referenced or incorporated therein.

262.   Chestatee violated the implied covenant of good faith and fair dealing by performing the acts described herein, including but not limited to, by fraudulently billing BCBS Georgia for laboratory testing of non-Chestatee patients that were performed at and by Reliance Labs as if it had been performed at and by Chestatee.

263.    In so doing, Chestatee failed to diligently and in good faith seek to comply with all portions of the terms of the HMO Contract.

264.    As a direct and proximate consequence of Chestatee's breach of the covenant of good faith and fair dealing, the BCBS Plans have suffered damages in an amount to be determined at trial.

## COUNT V
## FRAUD AND FRAUDULENT CONCEALMENT
### (Against All Defendants)

265.    The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

266.    As alleged herein, Defendants, individually and in furtherance of the fraudulent scheme alleged herein, made, or caused to be made, intentional misrepresentations of material facts relating to the claims they submitted or caused to be submitted to BCBS Georgia for reimbursement, with the intent to induce BCBS Georgia to rely on those misrepresentations and pay those claims.

267.    Each Defendant knowingly participated in the fraud by agreeing to submit the claims to BCBS Georgia as if the underlying laboratory testing were performed at and by Chestatee.

268.    Each Defendant's participation in the fraudulent scheme includes, but is not limited to, the following:

a.    <u>Chestatee</u>:  Durall Capital acquired Chestatee Regional Hospital in order to gain access to the hospital's participating status and favorable reimbursement rates with BCBS Georgia, both of which were essential to the success of the scheme.  Chestatee engaged the other Defendants, including Medivance, Reliance Labs, Neisha Carter Zaffuto, and Jorge Perez, to perform functions essential to the success of the scheme, and to use Chestatee's facility and billing information to submit the claims to BCBS Georgia.  Chestatee used the on-site laboratory at Chestatee Regional Hospital as a front for its fraudulent scheme, and took steps to undermine BCBS Georgia's efforts to identify and stop the scheme.  Chestatee conspired with the other Defendants to submit the claims at issue to BCBS Georgia while knowing that the claims contained material misrepresentations and omissions.  In addition, when payment was made by BCBS Georgia to Chestatee, Chestatee shared such payment with the other Defendants, in exchange for their participation in the fraudulent scheme.

b.    <u>Reliance Labs</u>:  Reliance Labs conducted the testing at issue in this case, in spite of the fact that it conspired with the other Defendants to submit the corresponding claims to BCBS Georgia as if the testing were

performed at and by Chestatee.  In addition, when payment from BCBS Georgia was passed on by Chestatee to Reliance Labs, Reliance Labs used a portion of that payment to fund kickbacks to referring providers, thereby perpetuating the fraudulent scheme.

c.    <u>Aaron Durall</u>:  Aaron Durall was responsible for the management of the scheme, and used his control over Chestatee (as CEO) and Reliance Labs (as President) to cause them to take the steps described above.  Aaron Durall was primarily responsible for the Defendants' conspiracy to commit this fraudulent scheme, causing Chestatee and Reliance's agreement, hiring Jorge Perez, and engaging Medivance and Neisha Carter Zaffuto to participate as well.  Aaron Durall created Durall Capital and, upon information and belief, arranged for its purchase of Chestatee Regional Hospital specifically to carry out this fraudulent scheme.  Aaron Durall also hired a team of employees or agents of Reliance Labs, through which he supervised and directed the payment of kickbacks to referring providers in exchange for their patients' specimens. Further, upon information and belief, Aaron Durall has personally received a substantial portion of the amount paid by the BCBS Plans as a result of this fraudulent scheme.

d.    <u>Medivance</u>:  Medivance agreed with Chestatee, Reliance Labs, Aaron Durall, Jorge Perez, and Neisha Carter Zaffuto to prepare and submit claims to BCBS Georgia on behalf of Chestatee, in spite of the fact that it knew the claims contained numerous material misrepresentations. Medivance worked closely with Chestatee and Aaron Durall to manage numerous functions of Chestatee Regional Hospital remotely from Florida (including billing and contracting with payors), in order to prevent on-site employees at Chestatee Regional Hospital and payors, including the BCBS Plans, from identifying this fraudulent scheme.  When BCBS Georgia attempted to renegotiated its contracts with Chestatee to address the fraudulent scheme, Medivance sought to stop the contractual changes to perpetuate the fraudulent scheme.  When BCBS Georgia implemented contractual and process changes to stop payment on claims stemming from this fraudulent scheme, Medivance modified its billing processes to evade those efforts, in spite of the fact that it knew the claims were fraudulent.

e.    <u>Jorge Perez</u>: Aaron Durall retained Perez to help manage Chestatee's finances and billing services, and to assist with overall management of the scheme.  Jorge Perez leveraged his healthcare

experience to assist Aaron Durall in perpetrating the pass-through billing arrangement.  Upon information and belief, Perez provided financial assistance (directly or indirectly) to Durall Capital and Aaron Durall's purchase of Chestatee Regional Hospital, with the expectation that the hospital would be used to perpetrate this pass-through billing scheme. Perez conspired with the other Defendants to submit the claims to BCBS Georgia in spite of the fact that he knew the claims contained numerous material misrepresentations.  Further, upon information and belief, Jorge Perez has received a substantial portion of the amount paid by the BCBS Plans as a result of this fraudulent scheme.

      f.   <u>Neisha Carter Zaffuto</u>:  As President of Medivance, Neisha Carter Zaffuto was responsible for Medivance's agreement to submit the claims at issue to BCBS Georgia on behalf of Chestatee, in spite of the fact that she knew the claims were not payable by BCBS Georgia, were fraudulent, and were in violation of multiple contracts between BCBS Georgia and Chestatee Regional Hospital.  After agreeing to participate in the scheme, Neisha Carter Zaffuto oversaw and directed Medivance's submission of fraudulent claims to BCBS Georgia on behalf of Chestatee, and caused Medivance to take the actions described above.

269.    Collectively, Aaron Durall, Jorge Perez, and Neisha Carter Zaffuto directed the conduct of the remaining Defendants, thereby causing their agreement to submit the fraudulent claims to BCBS Georgia.

270.    The claims submitted by Defendants, or that Defendants caused to be submitted, included the following material misrepresentations:

a.    provider name (misrepresented as Chestatee);

b.    provider street address (misrepresented as Chestatee);

c.    provider Tax ID and NPI (misrepresented as Chestatee);

d.    type of bill (misrepresented as "141," which represents a specimen submitted for analysis to a hospital);

e.    admission type (misrepresented as "2," which stands for "urgent" admission, when there was no admission);

f.    source of admission (misrepresented as "9," which stands for "information not available," when there was no admission);

g.    patient discharge status (misrepresented as "01," which represents a patient discharged to home or self-care, when there was no discharge); and

h.    attending physician and attending physician's NPI (misrepresented referring provider as an attending physician).

271.   Defendants falsely certified, or caused Chestatee to falsely certify, that the billing information on each claim submitted to BCBS Georgia was "true, accurate, and complete" and that they "did not knowingly or recklessly disregard or misrepresent or conceal material facts."

272.   Defendants also failed to disclose, or caused Chestatee to fail to disclose, material facts relating to the claims that Defendants submitted, or caused to be submitted, including that:

a.   Chestatee, Medivance, Reliance Labs, Aaron Durall, Jorge Perez, and Neisha Carter Zaffuto had conspired to participate in a pass-through scheme in breach of Chestatee's HMO, PAR, and PPO Contracts with BCBS Georgia;

b.   Aaron Durall and Reliance Labs paid kickbacks, or caused kickbacks to be paid, to referring providers or laboratories in exchange for their patient's specimens, resulting in those claims being billed to BCBS Georgia;

273.   Defendants intentionally designed and operated their scheme to conceal from BCBS Georgia the identity of the laboratory performing the testing, as well as the identities of the participants in their conspiracy.

274.   Defendants had a duty to disclose to BCBS Georgia information material to the claims that Defendants submitted, or caused to be submitted, to BCBS Georgia, so as not to mislead BCBS Georgia.

275.   Defendants took on this obligation every time they filed a claim, or caused a claim to be filed, as they certified that the claim was not "knowingly or recklessly disregard[ing] or misrepresent[ing] or conceal[ing] material facts."

276.   At the time that Defendants submitted the claims, or caused the claims to be submitted, they knew that the representations described above were false, and that the claims contained the above-described omissions.

277.   These misrepresentations and omissions were material to BCBS Georgia's determination of whether the claims were payable.

278.    Defendants intended for BCBS Georgia to rely on their material misrepresentations and omissions, such that BCBS Georgia would pay Chestatee for the claims arising from this pass-through scheme.

279.   In failing to disclose the aforementioned material omissions to BCBS Georgia, Defendants acted in bad faith.

280.   BCBS Georgia reasonably relied on the claims submitted to it by Defendants, including the misrepresentations and omissions, when determining whether to pay each claim.

281.   Had BCBS Georgia been aware that the claims contained material misrepresentations, or omitted material information, it would not have made the payments it did.

282.   Defendants had superior and special knowledge of their pass-through scheme, as set forth herein, and took steps to prevent BCBS Georgia from identifying the scheme.

283.   As a result, when BCBS Georgia received the claims, it was unaware of the pass-through scheme, which was not reasonably discoverable by BCBS Georgia.

284.   As a direct and proximate result of Defendants' material misrepresentations and omissions, the BCBS Plans have been damaged in an amount to be determined at trial.

## COUNT VI
## NEGLIGENT MISREPRESENTATION
### (IN THE ALTERNATIVE TO COUNT V)
**(Against All Defendants)**

285.   The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

286.   The claims submitted by Defendants, or caused to be submitted by Defendants, contained material misrepresentations, including but not limited to those described in paragraph 263, above.

287.    These representations were either false, made without reasonable grounds for believing them to be true, made without knowledge of their truth or falsity, made without reasonable care, or made under circumstances in which Defendants ought to have known their falsity.

288.    Defendants' misrepresentations were made to BCBS Georgia in the course of Defendants' business and because of a pecuniary interest.

289.    Defendants had a duty to disclose to BCBS Georgia information material to the claims that Defendants submitted, or caused to be submitted, to BCBS Georgia, to avoid misleading BCBS Georgia.

290.    Defendants took on this obligation every time they filed a claim, or caused a claim to be filed, as they certified that they were not "knowingly or recklessly disregard[ing] or mispresentin[g] or conceal[ing] material facts."

291.    Defendants failed to exercise reasonable care when making these representations.

292.    It was foreseeable that BCBS Georgia would rely on Defendants' representations, given the nature of the claims payment process, and the fact that they were submitted to BCBS Georgia by Chestatee and Medivance.

293.    BCBS Georgia reasonably relied on Defendants' representations, and paid the claims.

294.    If BCBS Georgia had been aware of the material misrepresentations,

BCBS Georgia would not have paid the claims.

295.    As a direct and proximate result of Defendants' misrepresentations,

the BCBS Plans have been damaged in an amount to be determined at trial.

**COUNT VII**
**TORTIOUS INTERFERENCE WITH BCBS GEORGIA'S**
**CONTRACTS WITH CHESTATEE**
**(Against Medivance, Reliance Labs, Aaron Durall, Jorge Perez,**
**and Neisha Carter Zaffuto)**

296.    BCBS Georgia incorporates by reference all preceding paragraphs as

if fully set forth herein and further alleges as follows:

297.    BCBS Georgia has three valid and enforceable contracts with

Chestatee (*i.e.*, the PAR Contract, the HMO Contract, and the PPO Contract).

298.    Through each of these Contracts, BCBS Georgia agreed to reimburse

Chestatee only for services provided by Chestatee.

299.    Similarly, each of the Contracts prohibited their assignment to third

parties without BCBS Georgia's prior written approval.

300.    By orchestrating and participating in the fraudulent scheme

described herein, Reliance Labs, Medivance, Aaron Durall, Jorge Perez, and

Neisha Carter Zaffuto caused Chestatee to breach its contracts with BCBS

Georgia by, among other things:

a.      Submitting claims to BCBS Georgia, or causing claims to be submitted to BCBS Georgia, for services not performed by, or performed under the direction and personal supervision of, Chestatee.

b.      Submitting claims to BCBS Georgia, or causing claims to be submitted to BCBS Georgia, that Reliance Labs, Medivance, Durall, Perez, and Zaffuto knew were not accurate, complete, and truthful, including but not limited to claims containing the following misrepresentations:

     i.      Provider name;

     ii.      Provider street address;

     iii.      Provider Tax ID and NPI;

     iv.      Type of bill;

     v.      Admission type;

     vi.      Source of admission;

     vii.      Patient discharge status; and

     viii.      Attending physician and attending physician's NPI.

c.      Assigning, delegating, subcontracting, or transferring the HMO and PAR Contracts or Chestatee's rights and responsibilities under the Contracts without the prior written consent of BCBS Georgia.

     d.    Submitting claims to BCBS Georgia, or causing claims to be submitted to BCBS Georgia, that Reliance Labs, Medivance, Durall, Perez, and Zaffuto knew were not reasonable and medically necessary, as defined by the Contract.

     e.    Paying, receiving, offering an incentive, or participating in an incentive program or arrangement that provides another physician or provider with a direct or indirect inducement to provide less than medically necessary health care services, supplies, accommodations, treatments or care to BCBS members.

301.    Each of Aaron Durall, Jorge Perez, Neisha Carter Zaffuto, Medivance, and Reliance Labs was aware of these Contracts, including that the Contracts covered only services provided by Chestatee and were unassignable.

302.    Upon information and belief, the reason that Aaron Durall and Durall Capital purchased Chestatee Regional Hospital was because of the hospital's agreements with payors, including with BCBS Georgia.

303.    Similarly, the reason that Aaron Durall, Jorge Perez, Neisha Carter Zaffuto, Medivance, and Reliance Labs agreed to this fraudulent scheme was because they knew that Chestatee's contracts with BCBS Georgia could be used to extract substantial reimbursement from BCBS Georgia, in exchange for which

each of the Defendants would receive a portion of the reimbursement paid by BCBS Georgia.

304. In other words, Defendants agreed to participate in a fraudulent scheme that would cause Chestatee to repeatedly breach each of its three contracts with BCBS Georgia.

305. Defendants' collective efforts to disrupt BCBS Georgia's investigation of this fraudulent scheme provide further evidence of Defendants' knowledge that their conduct was in violation of Chestatee's contracts with BCBS Georgia.

306. Reliance Labs, Medivance, Aaron Durall, Jorge Perez, and Neisha Carter Zaffuto improperly, wrongfully, willfully, and intentionally engaged in the fraudulent scheme described herein, thereby interfering with the HMO, PAR, and PPO Contracts, and causing Chestatee to materially breach each of those Contracts.

307. Reliance Labs, Medivance, Aaron Durall, Jorge Perez, and Neisha Carter Zaffuto's interference with BCBS Georgia's HMO, PAR, and PPO Contracts with Chestatee was not justified or privileged.

308. Reliance Labs, Medivance, Aaron Durall, Jorge Perez, and Neisha Carter Zaffuto's tortious interference with the HMO, PAR, and PPO Contracts

caused BCBS Georgia to pay for claims that were not payable by BCBS Georgia, were fraudulent, were in breach of the Contracts, and were otherwise unlawful.

309.    But for these Defendants' tortious interference with the PAR, HMO, and PPO Contracts, BCBS Georgia would not have paid these claims.

310.    The BCBS Plans are entitled to an award of compensatory damages, including consequential damages, together with interest and costs, and an injunction prohibiting Chestatee from continuing to engage in the tortious conduct described above.

**COUNT IX**
**RESTITUTION UNDER ERISA § 502(a)(3)**
**(Against all Defendants)**

311.    The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

312.    Many of the impacted group health plans are employer-sponsored group health plans covered by ERISA (the "**ERISA Plans**").

313.    The BCBS Plans have been delegated by the plan administrator of each of the ERISA Plans the discretionary authority to review and decide on claims for benefits under the ERISA Plans.

314.    The ERISA Plans also delegated to the BCBS Plans the authority to recover overpayments made by the BCBS Plans on the ERISA Plans' behalf.

315.    Because of the fraudulent scheme identified herein, the BCBS Plans have paid millions of dollars in benefits to Chestatee, and through Chestatee, to Reliance Labs, Medivance, Aaron Durall, Jorge Perez, and Neisha Carter Zaffuto.

316.    The BCBS Plans have standing to sue under ERISA § 502(a)(3) to obtain appropriate equitable relief to redress violations of the ERISA Plans and to enforce the terms of the ERISA Plans.

317.    As alleged herein, Defendants have submitted, or caused to be submitted, misleading and fraudulent claims to BCBS Georgia for payment of benefits for charges related to laboratory services that Defendants represented, or caused to be represented, were performed by Chestatee.

318.    BCBS Georgia relied on the claim information supplied by Defendants, or that Defendants caused to be supplied, in determining whether to pay the claims.

319.    Had BCBS Georgia been aware that the claims misrepresented the services in order to make them appear payable, when in fact they were not, it would not have made those payments.

320.    Based upon the fraudulent claims Defendants submitted, or caused to be submitted, to BCBS Georgia, Defendants received payments in excess of the amounts that they were actually entitled to receive for those services.

321.    Further, even if Defendants did not knowingly and intentionally submit misleading and fraudulent claims to BCBS Georgia, the BCBS Plans are entitled to equitable relief to enforce the terms of the ERISA Plans, and recover overpayments made to Defendants.

322.    This is particularly true where Defendants submitted claims, or caused claims to be submitted, for members of ERISA Plans pursuant to valid contractual assignments (or authorized representation agreements) received from ERISA Plan members.  In these instances, Defendants accepted the terms of the ERISA Plans and submitted claims, or caused claims to be submitted, that were subject to those terms.

323.    Further, by knowingly accepting payments from the ERISA Plans, Defendants became bound by the ERISA Plans' terms and conditions, including conditions related to overpayments.

324.    The ERISA Plans, by their terms, require the return of overpayments and amounts that were erroneously paid.

325.    Thus, even to the extent that Defendants did not intentionally overcharge BCBS Georgia, the BCBS Plans are entitled to equitable relief to enforce the terms of the ERISA Plans and recover these overpayments.

326. Because of Defendants' wrongful behavior, BCBS Georgia has paid millions of dollars in benefits to Chestatee, and, through Chestatee, to the other Defendants, which were not owed under the terms of the ERISA Plans.

327. The BCBS Plans seek equitable restitution to cover the assets that Defendants unlawfully obtained because of the conduct described herein.

328. Specifically, the BCBS Plans seek an Order imposing a constructive trust on the assets that Defendants received in the form of overpayments, as well as on any profits or income made by Defendants on those amounts.

329. The BCBS Plans also seek an Order restoring to the BCBS Plans — individually and on behalf of the ERISA Plans — the sums held in constructive trust by Defendants.

## COUNT X
## DECLARATORY AND INJUNCTIVE RELIEF
## UNDER ERISA § 502(a)(3) AND 28 U.S.C. §§ 2201 AND 2202
### (Against all Defendants)

330. The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

331. The BCBS Plans act as a claims fiduciary for the ERISA Plans.

332. Therefore, the BCBS Plans have standing to sue under ERISA § 502(a)(3) to enjoin any acts or practices that violate any provisions of the ERISA

Plans, and to obtain other appropriate relief to redress such violations or enforce plan provisions.

333.   Defendants have engaged in a scheme to defraud BCBS Georgia into paying amounts to Defendants in excess of amounts owed under the relevant ERISA Plans, and for services that are not covered under the relevant ERISA Plans' terms, as described herein.

334.   There is an actual case and controversy between the BCBS Plans and Defendants as to the claims Defendants submitted, and continue to submit, to BCBS Georgia, all of which arise from the fraudulent scheme described herein.

335.   Defendants' fraudulent scheme is deceptive, unfair, and unlawful.

336.   No payment is due to Defendants on any claims that are pending, or may be submitted in the future, where such claims arise from Defendants' fraudulent scheme.

337.   Defendants appear to disagree, and continue to submit fraudulent claims to BCBS Georgia.

338.   There is a *bona fide*, present, and practical need for a declaration as to the lawfulness of Defendants' actions, including whether BCBS Georgia has the right to deny the claims implicated by Defendants' actions and scheme.

339.    The BCBS Plans are entitled to a judgment declaring that Defendants' actions and business practices are unlawful, and that any claims for payment of benefits submitted by Defendants to BCBS Georgia because of this scheme are non-payable and void.

340.    The BCBS Plans also seek recovery of their reasonable and necessary attorney's fees and costs, pursuant to ERISA § 502(g)(1).

341.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the BCBS Plans are entitled to a judgment declaring that Defendants' actions and business practices are unlawful, even as to the non-ERISA plans impacted by this fraudulent scheme, and that any claims for payment of benefits submitted by Defendants as a result of their fraudulent scheme are non-payable and void.

**COUNT XI**
**UNJUST ENRICHMENT**
**(Against Medivance, Reliance Labs, Aaron Durall, Jorge Perez, and Neisha Carter Zaffuto)**

342.    The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

343.    Defendants fraudulently used the names and billing information of Chestatee to submit, or cause the submission of, claims to BCBS Georgia for services that were not performed at or by Chestatee, or on behalf of Chestatee patients.

344.   BCBS Georgia, relying on Defendants' representations that the services billed for using Chestatee's name and billing information were performed at and by Chestatee on behalf of Chestatee patients, issued reimbursements to Chestatee, which were shared with the other Defendants.

345.   Each Defendant, therefore, received a benefit from the BCBS Plans in the form of a share of reimbursements for services that should not have been reimbursed.

346.   Each Defendant has unjustly retained those benefits.

347.   Each Defendant should be required to make restitution for the benefits they received, retained, and appropriated because justice and equity require such restitution.

348.   Restitution is required by public policy to promote the stability of insurance markets and to avoid the continuing unjust enrichment of unscrupulous providers at the expense of insurance companies and patients.

349.   The BCBS Plans are entitled to restitution in an amount to be determined at trial, including but not limited to all amounts Defendants received from BCBS Georgia because of Defendants' scheme.

## **RELIEF REQUESTED**

WHEREFORE, the BCBS Plans respectfully request an award in their favor and granting the following relief:

a)   Actual and consequential damages in an amount to be determined at trial, plus interest;

b)   An order obligating Defendants to disgorge all revenues and profits derived from their scheme;

c)   An award of reasonable attorney's fees, in accordance with the relevant contracts;

d)   Punitive damages;

e)   Equitable relief, as described herein;

f)   An injunction prohibiting Defendants from continuing the scheme; and

g)   Any other relief that the Court deems just, proper, and/or equitable.

Dated: March 28, 2018          By:   *T. Joshua Archer*

**BALCH & BINGHAM LLP**
   T. Joshua R. Archer (Georgia #021208)
   30 Ivan Allen, Jr. Blvd. N.W., Suite 700
   Atlanta, GA 30308
   T: (404) 962-3556
   F: (404) 261-3656
   jarcher@balch.com

       - and -

**ROBINS KAPLAN LLP**
Jeffrey S. Gleason (*pro hac vice* motion forthcoming)
Randall Tietjen (*pro hac vice* motion forthcoming)
Jamie R. Kurtz (*pro hac vice* motion forthcoming)
Nathaniel J. Moore (*pro hac vice* motion forthcoming)
Amira A. ElShareif (*pro hac vice* motion forthcoming)
800 LaSalle Avenue
Minneapolis, MN 55402-2015
T: (612) 349-8500
F: (612) 339-4181
jgleason@robinskaplan.com
rtietjen@robinskaplan.com
jkurtz@robinskaplan.com
nmoore@robinskaplan.com
aelshareif@robinskaplan.com

***Attorneys for Plaintiffs***